Garsh, J.
The plaintiff, Beverly Bennett (“Bennett”), brought this suit against the Massachusetts Bay Transportation Authorily (“MBTA”)[1] asserting numerous causes of action arising out of her discharge from the MBTA’s employment in July of 1992. Trial on the plaintiffs claims was bifurcated to address first Bennett’s challenge to the mandatory, random urinalysis drug testing program implemented by the MBTA. The legal claims at issue during the first phase of the bifurcated trial are the plaintiffs claims for relief under 42 U.S.C. §1983 for alleged violation of the right to be free from unreasonable search and seizure guaranteed by the Fourth Amendment to the United States Constitution, G.L.c. 12, §§H and I for alleged violation of the right to be free from unreasonable search and seizure guaranteed by Article 14 of the Declaration of Rights, and G.L.c. 214, §1B for alleged invasion of privacy.[2]
Following a juiy-waived trial, the court orders entry of judgment for the defendant dismissing the claims that allege violations of 42 U.S.C. §1983 with respect to mandatory, random urinalysis drug testing, G.L.c. 12, §§11H and 1II, and G.L.c. 214, §1B.
FINDINGS OF FACT
Based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
In August of 1984, the MBTA hired Bennett as a part-time guard of the subway system. By December of 1986, she had been promoted to a motorperson. A motorperson drives rapid transit trains.
On July 15, 1991, Bennett was administratively suspended for a period of one day. On September 20, 1991, Bennett was administratively suspended for three days. On January 9, 1992, Bennett was administratively suspended for five days. A five day suspension is the “final chance” step in the MBTA’s progressive disciplinary scheme.
On June 4, 1992, Bennett, then a full-time motorperson, was selected by the MBTA for a random drug screen. At that time, the MBTA had no reason to believe that Bennett had ever been under the influence of illegal drugs during her employment. Bennett complied with the request to provide a urine sample.
Bennett’s random drug screen tested positive for cocaine. On June 10, 1992, Bennett was interviewed by a physician concerning the results of the test and was suspended for seven days pending discharge. By letter dated July 16, 1992, the MBTA advised Bennett that she was discharged from the employ of the MBTA for the following reasons:
*202 1. Violation of the Authority’s Rule for Trainmen and other Employees of the Rail Lines, Rule 6, Prohibited Acts, (c) Reporting for duty at any time in unfit condition after . . . using or under the influence of narcotics; and (e). . . any use of narcotics; in that on June 4,1992, you submitted to a random drug screen and the results proved positive for cocaine.
2. Violation of the Authority’s Drug and Alcohol Policy, Sections I, III, and IV(e); in that you tested positive for cocaine during a random drug screen which you submitted to on June 4, 1992.
3. Your prior record.
The MBTA had given Bennett a copy of the MBTA’s Drug and Alcohol Policy (“Policy") on January 5, 1990. She refused to sign the verification of employee notice that contained an acknowledgment of responsibility for familiarizing herself with the Policy and an acknowledgment that the Policy “constitutes the official policy" of the MBTA and that she was “governed by it."
The MBTA has approximately seven thousand employees. It provides public transportation in twenty-eight cities and towns; its ridership is approximately 700,000 persons per day. Riders depend upon operators to perform in a safe and responsible manner. The MBTA operates commuter railways, buses, rapid transit trains, and trackless trolleys. It operates every day of the year. The safety of the riding public and the MBTA’s- own employees is a paramount concern.
Before 1989, the MBTA conducted drug tests in the event of a fatal accident, based upon probable cause, and after an employee returned to work after identification of a substance problem if agreed to by the employee and the union. Virtually no employees were tested for probable cause.
In the late 1980s, the federal Urban Mass Transportation Authority (“UMTA”) proposed regulations thatwould require all public transportation systems, as a condition precedent to receiving federal funding, to implement pre-employment, probable cause, return to work, random, and post-accident drug testing. As a result, the MBTA formed a committee to develop a drug and alcohol policy for the MBTA. The committee included the MBTA’s deputy general manager, deputy head of labor relations, chief legal counsel, supervisor of employee counseling, and several others. After extensive discussion, a policy was recommended to the MBTA’s Board; the MBTA’s Drug and Alcohol Policy (“Policy”) was adopted in December of 1989.
Bennett, like all MBTA employees, received a copy of the Policy along with an executive summary and a cover letter from the General Manger of the MBTA. The purpose of the Policy was to establish guidelines to reduce the probability of accidents related to the illegal use or abuse of alcohol and drugs by employees of the MBTA. The Policy established procedures for testing employees concerning their possible lack of fitness for duty due to the presence of drugs and/or alcohol, and it established procedures pursuant to which employees with drug and alcohol problems could receive counseling and still maintain their employment.
The Policy strongly urges employees to self-refer to the Employee Counseling Services Unit (“ECS”). Any employee who does so and who complies with the treatment program outlined by ECS will not jeopardize job security or promotional opportunities, provided the employee demonstrates progress in the rehabilitation efforts resulting in improved job performance and/or correction of other work-related problems.
Employees are responsible for ensuring that no alcohol and no controlled substances or other psychoactive drugs (including marijuana, cocaine, opiates, phencyclidine [“PCP”], amphetamines, barbiturates, benzodiazepines, methadone, methacholine and propoxyphene, or their metabolites) are present in a part of their body. The Policy outlines five circumstances under which MBTA employees will be tested. Three of the categories are probable cause due to unfitness to perform job duties, post-incident and accident, and return to work after, inter alia, previously failing a post-accident/incident, probable cause, or random screen. These three categories apply to all MBTA employees and require two urine tests for the presence of drugs and a blood test for the presence of alcohol.
The remaining two categories — pre-employment urine test for the presence of drugs and random urine test for the presence of drugs — apply to safety-sensitive positions-only. “Safety-sensitive” employees and/or positions fall into any of the following five categories: operating a revenue service vehicle, controlling a dispatch or movement of a revenue service vehicle, maintaining a revenue service vehicle, maintaining equipment used in revenue service, and supervising the above functions. A motorperson is a safety-sensitive position who falls into the first category. Approximately seventeen hundred of the MBTA’s seven thousand employees hold safety-sensitive positions.
With respect to random tests, the Policy provides that employees who perform safety-sensitive positions shall be subject to drug testing on an unannounced and random basis and that a urine test will be used to screen for the presence of marijuana, cocaine, opiates, PCP, and amphetamines. Employees selected for the random test are drawn in a random and confidential manner and notified of their selection on the day the screen is. scheduled. The refusal of a safety-sensitive employee to submit to a random test will result in immediate suspension pending discharge.
The Policy mandates that all drug testing be done by a laboratory certified by the National Institute on Drug Abuse and/or an outside contractor, as required. When the laboratory receives the specimen, it first performs an initial screening assay test based on the ability of antibodies to recognize drugs in biological fluids. If the test is positive, then a confirmatory test *203 is done. The only confirmatory test permitted is a Gas Chromatography/Mass Spectrometry (“GC/MS”) test. The GC/MS test is the most accurate and reliable test technique available. The designated laboratory must have procedures to ensure that the chain of custody of specimens is secure and well-documented and that the process controls are thorough and reliable.
The MBTA’s Medical Services Department has responsibility to administer the urine tests for the random drug tests and to coordinate with the off-site facility. A clinic nurse accompanies the employee to the collection area and secures access to the soap dispenser and other items in the collection area that could be used to adulterate the specimen. Toilet bluing materials are in toilet water tanks used for urine collections. The employee selects a urine collection container; the clinic nurse then leaves the immediate collection area to give the employee privacy and waits outside the area until the employee finishes. When the clinic nurse returns to the collection area, the nurse takes the temperature of the urine and records it on the chain of custody/requisition form in the presence of the employee. The clinic nurse places tamper-proof tape over the lid and side of the collection container, which the employee initials and dates. Once the urine is collected, it remains within the employee’s view at all times until the employee initials the sealed chain of custody bag. In full view of the employee, the clinic nurse transfers the specimen from the collection container to the shipping container. The clinic nurse and employee then complete the chain of custody/requisition form. The specimen remains in control of the clinic nurse or in a secured area until shipment to the laboratory. Intrusion of the employee’s privacy is minimized to the extent possible.
The MBTA has a medical director of medical services who is board certified in internal medicine. The Medical Director functions as a Medical Review Officer. Pursuant to the Policy, the Medical Review Officer or his physician designee (referred to herein interchangeably as “MRO”) reviews the results of drug tests from the laboratory, verifies the laboratory report, and determines if the employee received a positive or negative result from the drug test. If the employee received a positive report, the employee is called into the clinic for a meeting with the MRO, who will review the individual’s medical history, including any medical records and other information provided. During the interview, the employee is afforded the opportunity to discuss the test results and to offer any additional or clarifying information that may explain the positive result.
The Policy requires that confidentiality be maintained throughout the drug screening process. To maintain confidentiality, written records are stored in locked containers in a secured location. Access to test results is strictly limited to those few individuals responsible for implementing the Policy or who have a legitimate business need to know.
The Policy makes clear the effect of failing to adhere to its terms. It incorporates a progressive disciplinary scheme. When a random test is positive for drugs or alcohol and the employee is a permanent employee with a satisfactory record, including no prior discipline within the preceding twenty-four months for any reason whatsoever, the first offense results in a thirty day suspension without pay, and the employee is also required to report to ECS and to follow the recommended treatment plan. At the end of thirty days, the employee is eligible to return to work, pending assessment by ECS and a drug/alcohol screen, and the employee must sign a return to work agreement with Labor Relations placing the employee at the final step of progressive discipline. When a random test is positive for drugs or alcohol and the employee has a record of prior discipline during the twenty-four months immediately preceding the test, none of which relates to drug/alcohol abuse, the first offense will result in a sixty day suspension without pay, except where the employee was previously at the final warning step of progressive discipline in which case the employee shall be indefinitely suspended pending discharge. Bennett was at the final warning step of progressive discipline before being tested.[3] Any employee who tests positive on a drug/alcohol screen for a second time, or who tests positive on a drug/alcohol screen for the first time, but has prior discipline within the preceding twenty-four months related to drug/alcohol abuse, also will be suspended pending discharge.
The procedures followed by the MBTA in selecting Bennett for random testing and the method in which the test was administered and reviewed conformed to the Policy.[4] Upon reporting to the clinic, Bennett was given a medical history form to complete. She provided a urine sample in privacy in a secure location in a medical environment. There is no evidence that Bennett was treated in anything other than a polite and courteous manner at all times.[5] The sample provided by Bennett was sent to a federally certified laboratory that met federal criteria for accuracy, privacy, and chain of custody; the laboratory also was certified by the College of American Pathologists. After the test was reported as positive, Bennett met with the MRO. If, at that time, Bennett had provided a legitimate medical explanation for her positive test result, the test would have been deemed to have been negative, and it would have had no negative consequences. There is no evidence that the MBTA failed to treat drug testing information relating to Bennett as confidential.
Because UMTA’s power to require public transportation systems to institute random testing was in doubt when the Policy was adopted,[6] the MBTA chose not to implement the random drug testing portion of the Policy so that it could further explore the legal *204 ramifications of random testing in the absence of a federal mandate while moving forward with employee training and education and the other aspects of the Policy.
An outside consultant developed an employee education and training program for the MBTA. Supervisors received special training about the Policy in general and the selection of persons for probable cause testing in particular; they were not, however, required to complete an examination to determine their proficiency after the training period. Starting with safety-sensitive employees, all employees were trained as to the contents of the Policy; at these training sessions, self-identification was encouraged.
The MBTA continued to assess the wisdom of implementing that portion of the Policy dealing with random drug tests and to monitor the steps taken to implement the Policy. A subset of the original committee continued to meet and to analyze the statistics being generated.
At all relevant times, the MBTA offered employee counseling services, including a twenty-four hour hot line and support groups for substance abuse counseling. An employee can self-refer or be referred by a supervisor. In either case, the employee meets with an ECS counselor, who assesses the presenting problem and suggests a course of action. Of the 837 employees who sought ECS assistance in 1991, 53.3% self-identified themselves as persons with substance abuse problems. In that same year, 23.4% sought help for family problems, and 20.4% sought help for emotional problems. Several of the employees who self-identify a marital or emotional problems, in fact, also have substance abuse problems. I infer that in the years immediately preceding 1991, a similarly large group of employees had substance abuse problems.[7]
In 1990, 31% of the 2,875 accidents or incidents reported to the Federal Transit Authority resulted in personal injuries. In 1991, 43% of the 2,042 accidents or incidents reported to the Federal Transit Authority resulted in personal injuries.[8]
In 1990, 502 MBTA employees were given non-random tests pursuant to the Policy. Thirty-six individuals, or 7.2%, tested positive. Of the 502 tests given, 171 were post-accident or probable cause tests. The 36 who tested positive were all in this category, amounting to a positive percentage rate of 21% for probable cause and post-accident tests. Fewer than 10 probable cause tests were administered. Nearly ten per cent of the post-accident tests produced a positive result. Of the 36 who tested positive, six tested positive for drugs and alcohol, seventeen tested positive solely for drugs, and thirteen solely for alcohol. The ratio remained approximately the same in 1991. The significant number of positives in the post-accident testing administered by the MBTA, along with the number of persons self-identifying as persons with substance abuse problems, demonstrate a substantial drug problem existed when the MBTA decided to implement random drug tests and when it tested Bennett.
Although supervisors were trained to detect signs of substance abuse or intoxication, the number of probable cause evaluations remained low, less than ten a year. Probable cause testing is not effective at the MBTA. Because of the nature of their work, most safety-sensitive employees work at a variety of locales in a relatively unsupervised work environment. Many of the locales are not conducive to close supervision. The average bus operator at the MBTA interacts approximately five minutes a day with a supervisor. The average motorperson at the MBTA interacts approximately thirty minutes a day with a supervisor. Safety-sensitive employees do not interact with supervisors enough for the supervisors to be in a position to make informed probable cause judgments. Supervisors also are often not in a position to monitor use of substance during the day. Moreover, visual inspection of employees generally is not sufficient to identify probable drug abuse. The nature of the drugs being screened through urinalysis makes it extremely difficult to detect whether a person has ingested such drugs or is simply relaxed, lethargic, joyous, or experiencing a host of other emotions not triggered by drug use. Supervisors undoubtedly are concerned about their ability to recognize whether an employee is under the influence of a drug and apprehensive about accusing an employee of illegal drug-related activity. Given the statistics on self-referral and post-accident/incident testings, and the expert testimony on the problems with detecting drug abuse, it is extremely unlikely that more probable cause tests were not performed because there was no problem with substance abuse among safety-sensitive employees, and the court does not draw that inference.
On December 28, 1990, there was a collision on the green line at the Arlington Street station. A motorperson crashed a trolley car into another trolley car injuring thirty persons. Twenty six persons were transported to the hospital by ambulance. The MBTA sustained significant damage to its property. The motorperson had a blood alcohol level above 0.10%. The MBTA’s Investigation Committee determined that the sole cause of accident was human error on the part of the operator of the striking vehicle, who was under the influence of alcohol and did not adhere to signal indications, speed, and operating procedures. The Investigation Committee recommended, among other thing, that the MBTA begin random drug testing for safety-sensitive operating personnel.[9]
The accident was the immediate trigger that prompted the MBTA to implement its Policy with respect to random testing in March of 1991 prior to being required to do so by the federal government.[10] The MBTA implemented random drug testing on March 4, 1991 to maximize the safety of the riding *205 public and its employees because safety-sensitive employees are in a position to significantly adversely affect public safety and the safety of other employees as well as to cause significant physical damage and because probable cause testing is inadequate to eliminate the risk posed by substance abuse among safety-sensitive employees. Further education and training of supervisors in selection of employees for probable cause training was not likely to be equally effective in eliminating that risk. The MBTA implemented random testing to deter use of illicit drugs by safety-sensitive employees and thereby reduce the probability of accidents.
Each of the drugs for which the urine of randomly selected safety-sensitive employees is analyzed has an effect on the human body which increases the likelihood that the safety of the riding public will be adversely impacted by its ingestion by safety-sensitive persons, such as drivers of rapid transit trains. The threshold levels for both the screening and confirmatoiy tests for marijuana, cocaine, amphetamines, opiates, and PCP, or the body breakdown of such drugs, correspond to federal guidelines.
Safe operation of a rapid transit train or other public transport vehicle demands a high level of alertness and attentiveness, good judgment, and quick reaction or response time. It is not possible to predict exactly how, or to what extent, an individual’s ability to operate a vehicle will be impaired by a particular drug dosage. Quite often, impairment would not be obvious to a supervisor. The ingestion of the drugs for which the MBTA tests safety-sensitive employees generally adversely affects reaction time and judgment. The perception, judgment, and quickness of response of motorpersons and other safety-sensitive employees is essential to the safety needs of the 700,000 people who ride the MBTA on a daily basis. Illegal drug use poses a significant danger to the safety and welfare of the citizens of the Commonwealth.
Cocaine is a powerful stimulant of the central nervous system, sometimes to the point of agitation and hyperactivity. As its stimulatory effect wears off, a counter-effect sets in, and depression is likely to occur without ingestion of more cocaine. Ingestion of cocaine may affect an individual's response time because, depending upon the amount taken and the time that has elapsed since ingestion, an individual may be unable to make a decision rapidly enough to respond appropriately or may make an inappropriate decision. Cocaine can affect perception by distorting reality. It is difficult for a supervisor to diagnose cocaine use simply by observing an employee.
Amphetamines have an effect on the body similar to cocaine: they are stimulants, but not as powerful. Like cocaine, as the stimulatory effect wears off, depression sets in. The effect of amphetamines on a user’s reaction time and perception is similar to cocaine. It is difficult for a supervisor to diagnose amphetamine use simply by observing an employee.
Marijuana has more subtle effects on the human body. It reduces anxiety and, depending upon the amount ingested, may cause mild hallucinations. Outward signs would not easily be apparent to a supervisor. Marijuana may slow down an individuals’s response time. Other than at very high doses, it is unlikely to adversely affect perception by distorting reality.
PCP’s are hallucinatory agents. Ingestion tends to induce delusion, disassociation, aggression, bizarre behavior, and psychotic episodes. PCP adversely affects both response time and perception.
Opiates, like heroin, induce a mental state of being able to tolerate pain; heroin reduces anxiety and makes an individual restful and calm. It is very hard for a supervisor to detect heroin use. There may be many reasons an employee might appear lethargic, sleepy, or inattentive. Heroin lengthens reaction time in the same way that alcohol does and may tend to distort the user’s perceptions and sense of reality.
Persistent drug use usually leads to increased ingestion and the negative or toxicological effects become more pronounced.
When random testing was first implemented at the MBTA in 1991, 25% of the safety-sensitive employee group was tested annually. The results of the tests were compiled and reviewed monthly by a monitoring committee. Of the total number of random tests conducted in the period March through December of 1991, 4.9% tested positive. As many as 10.9% of those tested randomly had a positive test in December of 1991, demonstrating a serious problem remained.
Fifteen months into the program, in May of 1992, the number of employees to be randomly tested increased to 50%. The number increased to 50% following a derailment unrelated to substance abuse and a safety review and audit conducted by a team of experts from the American Public Transportation Agency (“APTA”), the trade group for the public transportation industry. APTA recommended, among other things, an increase in the percentage of persons being randomly tested.
Prior to the increase in the number of persons to be randomly tested and prior to the testing of Bennett, Congress enacted the Omnibus Transportation Employee Testing Act which contained, among others, the following Congressional findings:
(1) alcohol abuse and illegal drug use pose significant dangers to the safety and welfare of the Nation;
(2) millions of the nation’s citizens utilize transportation by aircraft, railroads, trucks, and buses, and depend on the operation of aircraft, trains, trucks, and buses to perform in a safe and reasonable manner;
*206 (3) the greatest effort must be expended to eliminate the abuse of alcohol and use of illegal drugs, whether on duty or off duty, by those individuals who are involved in the operation of aircraft, trains, truck, and buses;
(4) the use of alcohol and illegal drugs has been demonstrated to affect significantly the performance of individuals, and has been proven to have been a critical factor in transportation accidents;
(5) the testing of uniformed personnel of the Armed Forces has shown that the most effective deterrent to abuse of alcohol and use of illegal drugs is increased testing, including random testing . . .
P.L. 102-143, Title V, §2.
Random testing of a very large percentage of employees, combined with explicit disciplinary consequences, is the best way to deter drug abuse among the safety-sensitive employee population.[11] Random drug testing programs deter employee drug use by raising the risk of apprehension and possible job termination. Random drug testing is an effective deterrent to drug abuse by safety-sensitive employees. More than education and probable cause testing, it conveys to the work force the message that the employer is serious about eliminating the risk of safety-sensitive employees working with illicit dugs in their system. The greater the percentage of safety-sensitive employees tested in a given year, the more effective is the deterrent effect because employees know that they probably will be tested. With a low percentage of safety-sensitive employees tested, employees often believe that they will not be selected and the program is not as effective. Probable cause testing is not an effective way to achieve the goal of preventing, as far as possible, substance abuse. Only by testing significant numbers of safety-sensitive employees is it possible to bring about the psychological or epidemiological conditions that convey to employees that substance abuse will not be tolerated. The awareness by employees that they will be tested at some point to assure conformity with the institution’s drug policy decreases drug abuse. The experience nationwide is that most employers that implement random drug testing find that once the random testing encompasses a high percentage of the target population group, the number of positives drop precipitously.[12] The Policy in effect when Bennett was tested was highly likely to be effective. A significant proportion of the total number of safety-sensitive employees were required to be tested each year and it was clear that there would be consequences for a positive test result.
The individual safety-sensitive employees selected by the MBTA for random testing are chosen by a computer program developed by an independent consultant. There is no human input as to who is and is not selected. The computer is programmed with the employee numbers — not names — of safety-sensitive employees; the numbers are updated monthly as the payroll changes. No employee at the MBTA has discretion to select or waive an individual. An individual employee cannot be added or deleted.
The MBTA performs an essential public service. Its motorpersons are engaged in safety-sensitive tasks. Motorpersons who are under the influence of drugs are more likely to make errors and to create safely risks. The Policy pursuant to which Bennett was tested was intended to deter use of illegal drugs by employees in safety-sensitive positions. Use of drugs by motorpersons tends to increase the probability of accidents and therefore increases the risks of personal injuries and or property damage. The Policy is intended to deter motorpersons and other safety-sensitive employees from using drugs before drug use affects their workplace performance and to prevent accidents that result from impairment of such employees by drugs.
RULINGS OF LAW
42 U.S.C. §1983
“There are few activities in our society more personal or private than the passing of urine.” Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 617 (1989), quoting National Treasury Employees Union v. Von Raab, 816 F.2d 170, 175 (5th Cir. 1987), off din part and vacated in part, 489 U.S. 656 (1989). Accordingly, the collection and testing of urine must be deemed searches under the Fourth Amendment. Skinner, 489 U.S. at 618 (upholding, against a Fourth Amendment challenge, government regulations that require blood and urine testing for drugs and alcohol for covered employees involved in certain train accidents).
The MBTA has met its burden of demonstrating that the search of Bennett was not unreasonable because the MBTA had a compelling interest in deterring drug use before it directly impaired the job performance of safety-sensitive employees such as motorpersons. Id. at 629, 630. See also National Treasury Employees Union v. Von Raab, 489 U.S. 656, 677 (1989) (urinalysis testing of employees who seek to be promoted to positions that directly involve the interdiction of illegal drugs and handling of firearms is reasonable under the Fourth Amendment). The expectations of privacy of those employees subject to random searches under the Policy “are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees.” Skinner, 489 U.S. at 627. As the Supreme Court has pointed out, safeiy-sensitive employees “discharge duties fraught -with such risk of injuiy to others that even a momentary lapse of attention can have disastrous consequences . . . [such] employees can cause great human loss before any signs of impairment become noticeable to supervisors or others.” Id. at 628.
The fact that Bennett was not visibly impaired does not mean that the Fourth Amendment categorically *207 prohibits requiring her to be tested. “[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable.” Id. at 624. The MBTA’s drug testing program did not mandate urinalysis without respect to the nature of an employee’s duties. Bennett’s job duties as a driver of rapid transit trains had a clear, direct nexus with the health and safety of others. The psychological effects of drug use “include impairment of judgment [and] slow reaction time ...” Veronia School District 47 J v. Acton, 515 U.S. 646, 661 (1995) (random urinalysis drug testing of students who participate in school athletics programs does not violate the Fourth Amendment).
Bennett’s position as a motorperson put her in a situation where she could have been very dangerous to the lives of the riding public, as well as other workers. Furthermore, as a motorperson, Bennett did not work in a traditional office environment where drug use may be more easily detected. The MBTA provided notice of the Policy to Bennett. There was no discretion as to whom would be tested. For the same reasons that the Fourth Amendment repeatedly has been held to permit random drug testing of safety-sensitive employees in the transportation industry, the MBTA’s Policy survives Fourth Amendment scrutiny. See, e.g., Railway Labor Executives Ass’n v. Skinner, 934 F.2d 1096 (9th Cir. 1991) (random drug testing of railroad workers in safety-sensitive position does not violate the Fourth Amendment despite the lack of a triggering event like an accident or safety rule violation); International Brotherhood of Teamsters v. Dep’t of Transportation, 932 F.2d 1292, 1306 (9th Cir. 1991) (“compelling interest” in preventing drivers of commercial vehicles from using illegal drugs while behind the wheel justifies random urinalysis under Fourth Amendment analysis); Bluestein v. Skinner, 908 F.2d 451, 455-57 (9th Cir. 1990), cert. denied, 498 U. S. 1083 (1991) (random testing of flight crew and other aviation personnel designed to deter drug use and to prevent the performance of safety-sensitive functions by employees under the influence'of narcotics does not violate their Fourth Amendment rights); National Treasury Employees Union v. Yeutter, 918 F.2d 968, 971-72 (D.C. Cir. 1990) (government’s interest in safety justifies random urinalysis drug testing of motor vehicle operators employed by Department of Agriculture who primarily chauffeur officials and deliver documents); American Federation of Government Employees v. Skinner, 885 F.2d 884, 892 (D.C. Cir. 1989), cert. denied, 495 U.S. 923 (1990) (random testing of Department of Transportation motor vehicle operators who drive passenger-laden shuttle buses upheld given “obvious safety interests”); Transport Workers’ Union of Philadelphia v. Southeastern Pennsylvania Transportation Authority, 884 F.2d 709, 712 (3d Cir. 1989) (public transportation authority’s random drug and alcohol urinalysis testing of its operating employees satisfies Fourth Amendment standards despite lack of a basis in “individualized suspicion”); Jones v. Jenkins, 878 F.2d 1476 (D.C. Cir. 1989) (governmental interest in the health and safely of handicapped children warranted routine drug testing of bus drivers and attendants who transport them); Keaveney v. Brookline, 937 F.Supp. 975, 986-87 (D.Mass. 1996) (random drug and alcohol testing of employees who drive commercial vehicles like dump trucks, cranes, and tractors, and who do not regularly transport passengers other than other employees or hazardous materials, is not unreasonable within the meaning of the Fourth Amendment because such large vehicles could be deadly in the hands of an employee lacking judgment as a result of drug or alcohol consumption and because deterrence of potentially hazardous behavior is a valid, substantial, and important governmental objective).
Bennett argues that, even if under certain circumstances, the Fourth Amendment permits random drug testing of safety-sensitive employees, the MBTA’s policy does not survive constitutional scrutiny because the MBTA did not spend enough time training supervisors to conduct probable cause tests. The evidence demonstrates that probable cause testing is not an equally effective deterrent. Even had there been more training, probable cause testing would have remained significantly less effective.[13] Moreover, the MBTA was not required to use the least restrictive alternative. See generally Veronia School District 47 J, 515 U.S. Ct. at 663; Skinner, 489 U.S. at 629, n.9.
A balancing of the intrusion of random testing on Bennett’s Fourth Amendment interests against the MBTA’s promotion of a legitimate and compelling governmental interest leads to the test conducted by the MBTA was reasonable and did not violate the Fourth Amendment. Bennett, therefore, is not entitled to relief under 42 U.S.C. §1983.
G.L.c. 12, §§H and I
The random urinalysis testing required by the Policy also constitutes a search and seizure for the purposes of Article 14.[14] O’Connor v. Police Comm’r of Boston, 408 Mass. 324, 326 (1990). The fact that the MBTA’s Policy passes muster under the Fourth Amendment does not automatically mean that it is permitted under the state constitution. Guiney v. Police Commissioner of Boston, 411 Mass. 328, 333 (1991). In Guiney, the Court rejected as unconstitutional under the Massachusetts Constitution a Boston Police Department rule authorizing random, mandatory urinalysis for Boston Police officers that had been held, in Guiney v. Roache, 873 F.2d 1557, 1558 (1st Cir.), cert. denied, 493 U.S. 963 (1989), not to violate a police officer’s Fourth Amendment rights.
The Supreme Judicial Court’s decision in Guiney does not, however, stand for the proposition that random drug testing can never survive state constitutional scrutiny.[15] In Guiney, there was “nothing in the record to indicate that Boston police officers have *208 unlawfully used controlled substances on or off duty.” Id. at 330. See also id. at 332 (“The record offers nothing to show that there is a drug problem in the Boston police department”). By contrast, this record shows that numerous employees at the MBTA self-identified themselves as having substance abuse problems and, in 1990, 7.2 per cent of all employees given non-random tests and 21 per cent of employees tested for probable cause or following an accident tested positive for drugs or alcohol. Of those who tested positive, 64 per cent tested positive for illicit drugs.
The Court in Guiney also noted that in that case there had been “no showing of how random drug testing by urinalysis will provide information that is needed to identify officers whose on-duty performance was affected by illicit drug use.” Id. at 330. Here, the MBTA has shown that urinalysis will provide information about the very kinds of drugs most likely to affect an operator’s ability to safely drive a rapid transit train, bus, or other transportation vehicle, and further, that it is needed to be done in this fashion given the relatively unsupervised work performed by persons such as Bennett and the difficulty of detecting drug usage. “Drug use is often difficult to discern.” O’Connor, 408 Mass. at 328.
In Guiney, there was “nothing in the record to indicate that there had been any problem, or any public perception of a problem, arising from the illicit use of drugs by Boston police officers.” Id. at 330. The number of employees testing positive in post-accident testing, combined with the number of employees self-identifying as substance abusers, viewed together with the nature of the work performed by safety-sensitive employees, demonstrates that when the MBTA tested Bennett, there was a genuine problem that needed to be addressed to protect the safety of the riding public. The MBTA was not obligated to prove that it had had numerous accidents actually caused by an operator’s illicit drug use, as opposed to several drivers testing positive post-accidents, given the undisputed and direct correlation between ingestion of drugs and impairment of ability to perform safety-sensitive tasks like driving.[16]
That there was a public perception of a problem arising from the illicit use of drugs by public transportation officials can also be inferred. In late 1990, a motorperson, while under the influence of alcohol, crashed a trolley car into another trolley car causing numerous personal injuries and substantial property damage. The Investigation Committee recommended random drug testing of safety-sensitive personnel.[17]
Finally, the policy at issue in Guiney applied to “all police officers.” Id. The MBTA Policy applies to a well-defined group of safety-sensitive employees. Moreover, the subcategory of safety-sensitive employees to which Bennett belonged as a driver of rapid transit trains is one with an immediate and obvious nexus to the hazards of drug use.
An intrusive testing process, such as urinalysis, can be justified under Article 14 only if there is “a strong factual showing that a substantial public need exists for the imposition of such a process ...” Id. The MBTA has made that showing with respect to operating personnel like Bennett. The MBTA relied on factual information with respect to its own employees. It acted not out of any abstract commitment to reducing drug usage in society in general or at the MBTA in particular, but to deter and detect a specific type of drug use among a specific category of personnel whose usage of such drugs had the potential of creating a significant risk to public safely. Cf. Commonwealth v. Trumble, 396 Mass. 81, 91 (1985) (use of roadblocks “in an attempt to deter and detect drunk driving” does not violate Article 14 in light of the demonstrated public interest in curtailing drunk driving, the advance notice provided to motorists, and the lack of discretion in the selection of motorists to be stopped).
The MBTA has met its burden of showing “a concrete, substantial governmental interest that will be well served by imposing random uranalysis on non-consenting” motorpersons. Guiney, 411 Mass, at 332.[18] Bennett is not entitled to relief under the Massachusetts Civil Rights Act because her testing, pursuant to the Policy’s carefully crafted guidelines, meets the requirements of article 14. It is not “unreasonable” within the meaning of that constitutional provision A. [19]
G.L.c. 214, §1B
The conclusion that the testing of Bennett did not violate either the Fourth Amendment or Article 14 “substantially resolves the plaintiffs claim under G.L.c. 214, §1B as well.” O’Connor, 408 Mass. at 329. That statute provides, in relevant part, that a person “shall have a right against unreasonable, substantial or serious interference with his privacy.” The Privacy Act proscribes “the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest.” Bratt v. International Business Machines Corp., 392 Mass. 508, 518 (1084). An employer’s legitimate interest in determining its employees’ effectiveness in their jobs must be balanced against the seriousness of the intrusion on the employees’ privacy. Id. at 520. An employer may have a substantial and valid interest in aspects of an employee’s health that could affect that employee’s ability effectively to perform job duties. Id. at 524.
As discussed above, the MBTA had a compelling interest in determining whether drivers of rapid transit trains were using illicit drugs and in deterring such use. Those interests outweigh Bennett’s privacy interest. Furthermore, the testing procedures themselves to which Bennett was subjected were not unreasonably intrusive to an objective person. There was no *209 visual monitoring of her urination. There is also no evidence that the dissemination or publication of information concerning Bennett was overly broad or that the MBTA sought any information through its testing beyond the presence of the specified drug metabolites. Any interference with Bennett’s privacy was not “unreasonable, substantial or serious” within the meaning of the statutory words. Webster v. Motorola, Inc., 418 Mass. 425, 433 (1994) (corporation’s legitimate business interest in ensuring that employee not operate motor vehicle while intoxicated by drugs outweighs employee’s privacy interests under the Privacy Act); Folmsbee v. Tech Tool Grinding & Supply, Inc., 417 Mass. 388, 394 (1994) (requiring tool grinder whose work required her to be constantly alert and extremely careful to submit to drug testing in the absence of any particularized suspicion that she had ingested illegal drugs did not violate c. 214, §1B); O’Connor, 408 Mass, at 330-31 (mandatory drug testing of police cadet consistent with article 14 did not violate cadet’s statutory right to privacy).
Bennett, therefore, is not entitled to relief under c. 214, §1B.
Res Judicata/Collateral Estoppel
The MBTA argues that plaintiffs constitutional and statutory challenges to her random drug test may not be maintained under the principles of res judicata and/or collateral estoppel because she had a full and fair opportunity to litigate these claims as a member of the union which challenged the Policy in Local 589, Amalgamated Transit Union v. Massachusetts Bay Transportation Authority, Suffolk Superior Court Civil Action No. 91-0633, and because the order denying a preliminary injunction in that case stated that “[ajffidavits presented by the MBTA . . . provide concrete evidence of a drug problem among MBTA employees, including those in safety-sensitive positions.” That decision does not prevent Bennett from seeking the relief sought here.
The MBTA did not include either res judicata or estoppel as an affirmative defense in its answer. See M.R.Civ.P. 8(c) (“In pleading ... a party shall set forth affirmatively . . . estoppel . . . res judicata . . .”). Accordingly, it may not now secure dismissal based on res judicata or collateral estoppel.
Moreover, the Union’s suit was filed before Bennett had been selected for testing; while the potential existed for violation of her constitutional rights or invasion of her privacy, those claims for money damages had not yet accrued. Cf. Ramar Coal Co. v. International Union, United Mine Workers, 814 F.Supp. 502, 509 (W.D. Va. 1993) (an action to enjoin prospective unlawful conduct lacks the kind of substantial legal identity required for the application of res judicata or collateral estoppel to bar an action seeking damage for completed actions). Furthermore, the decision relied upon by the MBTA was evaluating only the probabilities of success in the context of a motion seeking preliminary injunctive relief. The court did not itself find concrete evidence of a drug problem among the MBTA employees; it simply noted that the affidavits presented by the MBTA provided such evidence and, in a decision which pre-dated Guiney, held that it was probable a court would find that the government’s interest in preventing a catastrophic accident by a drug-impaired MBTA outweighed an employee’s privacy interest. The language used by the court makes it clear that the decision was “merely tentative in the very action in which it was rendered.” Restatement (Second) of Judgments §13, comment a. “Finality will be lacking if an issue of law or fact essential to the adjudication of the claim has been reserved for future determination.” Id. at comment b. There also is no evidence that Bennett received any form of notice of the Union’s action.
In sum, the failure of the Union to appeal the preliminary injunction ruling does not bar Bennett from seeking money damages for the violations alleged in this suit.
ORDER
For the reasons set forth above, it is hereby ORDERED that judgment be entered for the Massachusetts Bay Transportation Authority dismissing so much of the complaint that seeks relief pursuant to:
1. 42 U.S.C. §1983 with respect to the Fourth Amendment
2. G.L.C. 12, §§11H and 111, and
3. G.L.c. 214, §1B.

 The action was also brought against the defendant Boston Carmen’s Union, Division 589 (“Union"). Bennett alleged that the Union breached its duty of fair representation by failing to arbitrate Bennett’s discharge and that the decision not to arbitrate was racially motivated. Summary judgment has been entered in favor of the Union.

 The remaining claims are those for alleged violations of 42 U.S.C. §§1981, 42 U.S.C. §1983 (racially motivated termination, termination arising out of the disparate impact of the MBTA’s Drug and Alcohol Policy, racially motivated refusal to re-hire, and denial of the right to due process by refusing to grant plaintiff a name-clearing hearing), breach of contract between the MBTA and the Urban Mass Transportation Authority, breach of the collective bargaining agreement between the MBTA and the Union, defamation, and breach of contract between plaintiff and the defendant.

 Bennett was placed on final warning status on January 9, 1992.

 Although the Policy states that the employee must present photo identification at the collection site, it goes on to provide that an alternative method of identification may be used. When Bennett appeared for her random test, she did not have a picture identification. Her identification was verified by the Chief Inspector. Bennett does not dispute that she, indeed, provided the urine sample.

 Bennett did not testify. There is no evidence that she found the random test procedure particularly embarrassing, offensive, or invasive of her privacy.

 On December 14, 1989, the United States Court of Appeals for the District of Columbia heard argument on a challenge by local transit worker unions to the validity of drug testing regulations promulgated by UMTA. On January 19, *210 1990, the Court invalidated those regulations; it held that UMTA lacked the power to require public transportation systems to implement drug testing policies. Amalgamated Transportation Union v. Skinner, 894 F.2d 1362 (D.C. Cir. 1990).

 Of the 872 employees who sought ECS assistance in 1992, 34.5% self-identified themselves as persons with substance abuse problems. In that same year, 27.3% sought help for family problems, and 21.5% sought help for emotional problems.

 There is no evidence in this record as to the total number of accidents in which train and bus operators of the MBTA were involved or the dollar value of losses caused by such accidents or the total number of persons who suffered injuries as a result of such accidents, the total number of employees determined to be responsible for such accidents, the number of operators tested as a result of accidents, the number of accidents which the MBTA determined to have been caused by substance abuse, the number of fatalities or injuries or the amount of property damage that the MBTA determined to have been caused by one of its operators being under the influence of alcohol or drugs in the five year period leading up to the testing of Bennett or the five years preceding the decision to implement the random testing component of the Policy. Such statistics were not reviewed by the committee which recommended implementation of random drug testing. The court does not infer that the MBTA’s failure to introduce such evidence at trial or during its pre-trial deposition or its failure to collate such statistics before implementing random drug testing means that there was no substance abuse problem at the MBTA.

 By the time the report was formally issued on April 4, 1991, the recommendation for random drug testing had already been implemented.

 The Omnibus Transportation Employee Testing Act of 1991 instructs the Secretary of Transportation, “in the interest of mass transportation safety,” to promulgate regulations requiring mass transportation operations that are recipients of federal financial assistance to conduct random testing of mass transportation employees who perform safeiy-sensitive functions. 49 U.S.C. §5331. Pursuant to that statute, the Federal Transit Administration ultimately promulgated drug and alcohol testing regulations, which remain in effect today and which require, inter alia, random drug testing of the MBTA’s safety-sensitive employees. 49 C.F.R. §653.47.

 I find the uncontradicted and un-cross-examined testimony of Dr. Bryan Finkle, an expert toxicologist, to be extremely credible.

 Indeed, the year the MBTA increased random testing from 25% to 50%, the percentage of positives dropped from 4.9% to 2.7%. The first full year 50% of safeiy-sensitive employees were tested, it dropped further to 2.0% and that number has continued to steadily decline. The findings on the efficacy of random testing are, however, based on the expert testimony and not the MBTA’s statistics following adoption of random testing.

 The Supreme Court similarly recognized that, as the Federal Railroad Administration had found, “an impaired employee . . . will seldom display any outward ‘signs detectable by the lay person or, in many cases, even the physician.’" Skinner, 489 U.S. at 628. See also National Treasury Employees Union v. Von Raab, 489 U.S. at 674 (“Detecting drug impairment on the part of employees can be a difficult task, especially where, as here, it is not feasible to subject [customs] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments.”).

 At present, the MBTA is required by federal law to have a random drug testing program covering safety-sensitive employees. Keaveney v. Brookline, 937 F.Supp. at 982-86 (Supremacy Clause precludes arguments that the Policy today is invalid under state law). The MBTA has withdrawn its claim of preemption raised in the Pre-Trial Memorandum because it tested Bennett before being required to do so by the federal government.

 Indeed, the Supreme Judicial Court has taken care to “express no opinion” as to the result it would reach if confronted with a case in which the state interest concerned public safety considerations such as those faced in the context of railroad employees. Horsemen’s Benevolent & Protective Ass’n v. State Racing Comm’n, 403 Mass. 692, 703 n.3 (1989) (where purpose of random drug testing program is to prevent improperly won or lost horse races and not irretrievable catastrophes, random testing is invalid under article 14). See also Johnson v. MBTA, 418 Mass. 783, 786 n.1 (1994) (“Because there was probable cause [to test an MBTA bus driver], we need not decide whether in some situations the responsibilities of an employee are so important to the public safety that, in the absence of consent, a public employer may nevertheless require testing for drugs on the basis of something less than probable cause”).

 Cf. Exxon Corp. v. Esso Workers' Union, Inc., 118 F.3d 841, 849 (1st Cir. 1997) (“The notorious mishap involving the Exxon Valdez, which produced vast environmental devastation, highlights the core problem associated with this ‘wait- and-see’ approach. If we have learned anything from such catastrophes, it is that employers must act affirmatively to avoid drug-related accidents rather than wait passively for such accidents to happen”).

 The Congressional findings in the Omnibus Transportation Employee Testing Act, promulgated before the date that Bennett was tested, is additional evidence of a public perception of a problem. See also S. Rep. 102-54, 102d Congress, 1 st Sess. 5-6 (1991) (detailing transit accidents involving drug or alcohol use).

 “[Piersons who are under the influence of narcotics or other intoxicants should not be permitted to operate commercial vehicles on public highways.” Exxon Corp. v. Esso Workers' Union, Inc., 118 F.3d at 847.

 Because the testing of Bennett did not violate Article 14, it is unnecessary to address the MBTA’s argument that it engaged in no act of threat, intimidation, or coercion within the meaning of G.L.c. 12, §§11H and I. Relying on Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 95 (1989), Bennett maintains that conditioning her continued right to receive the fruits of her employment contract with the MBTA on submission to an unconstitutional test constitutes “coercion." Webster v. Motorola, Inc., 418 Mass. 425, 430 (1984), relied upon by the MBTA, is distinguishable since it did not involve employees governed by the terms of a collective bargaining agreement. In that case, the Court concluded that conditioning continued employment on submission by at-will employees to drug testing did not constitute threat, intimidation or coercion since the employees had no contract right to their positions. Similarly, in Bally v. Northeastern University, 403 Mass. 713, 720 (1989), the Court held that a state civil rights act claim based on conditioning participation in college athletics on submission to drug testing fell outside c. 12, §1II because the university’s action involved neither a physical confrontation accompanied by a threat of harm or loss of a contract right. More recently, in Johnson v. MBTA, 418 Mass. at 786, the Court found that “requiring testing as a condition of continued employment of a probationary employee would not be impermissible coercion in [a] case involving the operator of a public conveyance” where there was probable cause to test.